**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| DSS a.s., | |
| *Plaintiff/Counterclaim Defendant*, | |
| v. | Civil No. 1:24-CV-01331-MSN-LRV |
| PACEM Defense LLC, | |
| *Defendant/Counterclaimant*. | |

## <u>PACEM DEFENSE'S OPPOSITION TO</u>
## <u>D.S.S.'S MOTION TO DISMISS PACEM DEFENSE'S COUNTERCLAIMS</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

COUNTERSTATEMENT OF THE FACTS ...................................................... 2

    A. PACEM Defense Receives Nearly $▮▮▮▮▮ From BBM To Manufacture
       Grenades For The Ukraine National Police. ........................................... 2

    B. PACEM Defense Is Deprived Of The Benefit Of The BBM Agreement Due
       To BBM's Fraudulent Conduct. ............................................................. 3

    C. PACEM Defense Attempts To Salvage The Deal By Entering Into A
       Replacement Contract With DSS. .......................................................... 4

    D. DSS Deprives PACEM Defense Of The Benefit Of The DSS Agreement. ............... 6

    E. PACEM Defense Works To Fulfill Its Contractual Obligations And Avoid
       The Harm Caused By DSS. .................................................................... 7

LEGAL STANDARD ........................................................................................ 8

ARGUMENT ...................................................................................................... 9

I.    PACEM Defense Has Plausibly Alleged Standalone Counterclaims Seeking
    Damages Caused By DSS, Not Merely Affirmative Defenses. ........................................ 9

    A. PACEM Defense Has Plausibly Alleged Harm. ......................................... 9

    B. PACEM Defense's Counterclaims Are Properly So Designated And, If Not,
       Should Be Redesignated As Defenses Only After Discovery Is Complete. .............. 11

II.    DSS's Secondary Arguments Fail. ......................................................... 16

    A. DSS's Attempt To Rehabilitate Its Fraudulent Misstatements Is Illogical
       And Relies On Improper Inferences In Its Favor. ....................................... 17

    B. DSS's Effort To Defeat The Breach Of Contract Counterclaim Distorts
       The Law And The Facts. ...................................................................... 19

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*ACA Fin. Guar. Corp. v. City of Buena Vista, Virginia*,
  917 F.3d 206 (4th Cir. 2019) ................................................................ 28

*Bank of U.S. v. Asia Pulp & Paper Co.*,
  No. CIVA 03-8554, 2008 WL 465169 (S.D.N.Y. Feb. 6, 2008) ........................ 13, 14

*Beatley v. Ayers*,
  851 F. App'x 332 (4th Cir. 2021) ........................................................ 11, 16

*Boggs v. Duncan*,
  121 S.E.2d 359 (Va. 1961) ................................................................ 22, 23

*Cars Unlimited II, Inc. v. Nat'l Motor Co.*,
  472 F. Supp. 2d 740 (E.D. Va. 2007) ...................................................... 10

*CMF Virginia Land, L.P. v. Brinson*,
  806 F. Supp. 90 (E.D. Va. 1992) ........................................................ 13, 14

*Connect IT Sols., Inc. v. Fidelis Cybersecurity, Inc.*,
  No. 1:17-CV-1306, 2019 WL 8112895 (E.D. Va. Jan. 28, 2019) ........................ 20

*Coon v. Fed. Nat'l Mortg. Ass'n*,
  No. 3:18-CV-00108, 2019 WL 2656208 (E.D. Va. June 27, 2019) ...................... 28

*Cox v. SNAP, Inc.*,
  859 F.3d 304 (4th Cir. 2017) ............................................................ 20, 25

*Creech v. Everbank*,
  467 F.Supp.3d 425 (E.D. Va. 2020) ........................................................ 11

*Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*,
  No. 7:16-CV-00489, 2020 WL 929580 (W.D. Va. Feb. 26, 2020) ...................... 20

*E. Claiborne Robins Co. v. Teva Pharm. Indus. Ltd.*,
  No. 3:18-CV-00827, 2020 WL 5749936 (E.D. Va. Sept. 25, 2020) ...................... 9

*Empower AI, Inc. v. Dillahay*,
  No. 1:24-CV-00083, 2024 WL 4351437 (E.D. Va. Sept. 30, 2024) ...................... 10

*Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  518 F. App'x 178 (4th Cir. 2013) ........................................................ 14, 16

*Feld v. United States*,
  No. 1:23-CV-00840, 2024 WL 457777 (E.D. Va. Feb. 5, 2024) .......................... 8

*Glob. Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*,
  632 F. Supp. 2d 224 (W.D.N.Y. 2009) .................................................... 13

*Grasso v. Berg*,
  113 F.3d 1232 (4th Cir. 1997) ............................................................ 26

*Hamilton v. Suntrust Mortg. Inc.*,
    6 F. Supp. 3d 1300 (S.D. Fla. 2014) ...................................................................... 24

*In Re Estate of Cook*,
    No. 1:23-CV-00009, 2023 WL 3467209 (E.D. Va. May 15, 2023) ......................... 26

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
    No. 07 CV. 0432, 2009 WL 3124219 (S.D.N.Y. Sept. 29, 2009) ........................... 22

*Jadcap Mach. Works, Inc.*,
    No. 1:22-CV-01425, 2023 WL 4937393 (E.D. Va. July 10, 2023) .......................... 10

*L3Harris Mar. Servs., Inc. v. BAE Sys. Norfolk Ship Repair Inc.*,
    No. 2:23-CV-00259, 2024 WL 4642961 (E.D. Va. Oct. 30, 2024) .......................... 20

*Manotas v. Ocwen Loan Servicing*, LLC,
    794 F. App'x 259 (4th Cir. 2019) ........................................................................... 13

*Mawyer v. Atl. Union Bank*,
    No. 3:21-CV-00726 , 2022 WL 1049311 (E.D. Va. Apr. 7, 2022) ...................... 26, 29

*Monton v. Am.'s Servicing Co.*,
    No. 2:11-CV-00678, 2012 WL 3596519 (E.D. Va. Aug. 20, 2012) ......................... 28

*Moore Bros. Co. v. Brown & Root, Inc.*,
    207 F.3d 717 (4th Cir. 2000) ................................................................................. 25

*Moore v. Equitrans, L.P.*,
    818 Fed. App'x 212 (4th Cir. 2020) ........................................................................ 11

*Morris v. Wilmington Sav. Fund Soc'y*,
    360 F. Supp. 3d 363 (W.D. Va. 2018) .................................................................... 23

*Pfahning v. Cap. One Bank (USA), N.A.*,
    570 F. Supp. 3d 337 (E.D. Va. 2019) ..................................................................... 29

*R.G. Pope Const. Co. v. Guard Rail of Roanoke, Inc.*,
    244 S.E.2d 774 (Va. 1978) ............................................................................... 22, 23

*Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Est. Co., LLC*,
    806 S.E.2d 740 (Va. 2017) ..................................................................................... 22

*Ross v. Indep. Ord. of Foresters*,
    No. 4:23-CV-00064, 2024 WL 2294876 (E.D. Va. Feb. 12, 2024) ............... 14, 15, 16

*Scratch Golf, LLC v. Beaufort Cnty.*,
    No. 21-2284, 2024 WL 575370 (4th Cir. Feb. 13, 2024) .......................................... 9

*SecureInfo Corp. v. Telos Corp.*,
    387 F. Supp. 2d 593 (E.D. Va. 2005) ..................................................................... 11

*Stone Motor Co. v. Gen. Motors Corp.*,
    293 F.3d 456 (8th Cir. 2002) ................................................................................. 24

*Stoney Glen, LLC v. S. Bank & Tr. Co.*,
   944 F. Supp. 2d 460 (E.D. Va. 2013) ................................................. 23

*Sunrise Continuing Care, LLC v. Wright*,
   671 S.E.2d 132 (Va. 2009) ................................................................. 11

*Thompson v. Alfred St. Baptist Church*,
   No. 1:24-CV-00980, 2024 WL 4806267 (E.D. Va. Nov. 15, 2024) ..................... 9, 18

*Va. Vermiculite Ltd. v. W.R. Grace & Co.*,
   156 F.3d 535 (4th Cir. 1998) ............................................................. 24

*Vaughan v. Recall Total Info. Mgmt., Inc.*,
   217 F. App'x 211 (4th Cir. 2007) ....................................................... 14

*Wood v. Southside Physician Network, LLC*,
   No. 3:19-CV-00144, 2019 WL 3416665 n.5 (E.D. Va. July 29, 2019) .................. 11

*XL Specialty Ins. Co. v. Truland*,
   No. 1:14-CV-01058, 2015 WL 925595 (E.D. Va. Mar. 3, 2015) ............... 13, 14, 15

## **Statutes**

Va. Code § 8.1A-304 ................................................................................. 23

Va. Code § 8.2-103(1)(b) ............................................................... 24, 26, 29

## **Rules**

Federal Rule of Civil Procedure 9(b) ..................................................... 18

## **Other**

6 Fed. Prac. & Proc. Civ. § 1407 ............................................................ 14

13 Williston on Contracts § 39:7 (4th ed.) ............................................. 22

Restatement (Second) of Contracts § 205 ............................................... 24

Restatement (Second) of Contracts § 245 (1981) ........................... 21, 23, 25

## INTRODUCTION

DSS twice told this Court half the facts to accuse PACEM Defense of fraud. The Court now has before it the rest of the story, which proves that if any party was defrauded, it was PACEM Defense. DSS intentionally lied to PACEM Defense about whether DSS's business partner BBM—then (and presumably still) under criminal investigation—would be involved in the parties' contract to export sensitive munitions to a war zone. When that DSS lie first came to light, PACEM Defense did the right thing by informing the State Department. DSS's multiple misrepresentations to PACEM Defense about BBM's noninvolvement constitute fraud in the inducement and breached DSS's duty of good faith and fair dealing.

DSS continues to litigate this case as if the facts that it prefers to ignore do not exist. DSS's motion either ignores or misconstrues PACEM Defense's allegations in an attempt to undercut the counterclaims, but DSS does not offer any basis to grant its motion. The barebones motion casts up so many abbreviated, unsupported arguments that, unfortunately, it compels a longer response first to unpack, and then to reject, DSS's arguments.

*First*, DSS argues that the counterclaims are merely affirmative defenses. DSS cites no authority holding this, and governing case law says the opposite. PACEM Defense has plausibly alleged harm that can exceed—and is distinct from—the money actually paid by DSS, an amount that DSS continues to obscure. Moreover, even if there were some merit to a redesignation of the counterclaims as defenses, that would properly occur at the end of discovery, not now.

*Second*, DSS seeks to undermine PACEM Defense's fraud allegations with the self-serving inference that because DSS admitted the truth to PACEM Defense later, it must not have lied before. This argument, apart from being illogical, flatly violates the standard of review. The Court must accept PACEM Defense's well-pleaded allegations that DSS lied, on purpose, which constituted fraud in the inducement.

1

***Third***, DSS retreats to several related strawman arguments that PACEM Defense has failed to allege a breach of the duty of good faith and fair dealing.  The Court can easily reject each contention as contrary to well-established Virginia law.  No amount of contortion, either of the parties' contract or Virginia law, provides DSS a basis to dismiss PACEM Defense's contract counterclaim.

## COUNTERSTATEMENT OF THE FACTS

### A.     PACEM Defense Receives Nearly $ ▇▇▇▇ From BBM To Manufacture Grenades For The Ukraine National Police.

PACEM Defense has received over $ ▇▇▇▇ to produce and ship ▇▇▇ grenades to the Ukraine National Police, but a large portion of those funds were paid by Battle Born Munitions, Inc. ("BBM") under a separate, prior contract and not paid by DSS. In a contract dated June 27, 2023 (the "BBM Agreement"), PACEM Defense originally agreed to manufacture and ship to BBM 40-millimeter M430A1 High Explosive, Dual Purpose (HEDP) ammunition cartridges ("grenades") for export to the Ukraine National Police. Countercls., ECF 68, at ¶¶ 13–16. At the time, BBM purported to be, and PACEM Defense believed them to be, an authorized broker and U.S. exporter of defense articles registered with the United States Department of State's ("State Department's") Directorate of Defense Trade Controls ("DDTC"). *Id.* ¶ 15. Under the BBM Agreement, PACEM Defense and BBM agreed that PACEM Defense would manufacture and ship ▇▇▇ grenades in eight shipments of ▇▇▇ grenades. *Id.* ¶¶ 26–27. Each of the eight shipments would be manufactured and shipped by PACEM Defense to BBM, who would then ship the grenades overseas to Plaintiff DSS, a.s. ("DSS"), for delivery to the Ukraine National Police. *Id.* ¶¶ 2, 16, 22. Between June 30, 2023, and July 5, 2023, BBM wired to PACEM Defense $ ▇▇▇▇ to cover the initial 50% deposit for the eight shipments. *Id.* ¶ 24. On September 19, 2023, BBM wired an additional $ ▇▇▇▇ to PACEM Defense to cover the remaining balance

owed on the first shipment. *Id.* ¶ 27. Having received $████ from BBM, PACEM Defense

shipped the first shipment of ████ grenades to BBM that same day. *Id.* ¶ 28.

**B.      PACEM Defense Is Deprived Of The Benefit Of The BBM Agreement Due To BBM's Fraudulent Conduct.**

      The first shipment of grenades that departed PACEM Defense's facility in September 2023

never left the United States because, unbeknownst to PACEM Defense, BBM had fraudulently

obtained export approval from the State Department prompting a criminal investigation. *Id.* ¶ 29.

On October 11, 2023, the U.S. Customs and Border Protection Agency ("CBP") seized the first

shipment of grenades in Leland, North Carolina. *Id.* ¶ 30. According to an October 17, 2023 Notice

of Seizure sent to PACEM Defense, CBP seized the munitions due to (i) BBM's failure to obtain

the required export approvals and/or licenses, and (ii) BBM's use or attempted use of any export

document or license containing a false statement or a misrepresentation or omission of material

fact. *Id.* ¶¶ 32–35. Weeks later, in a November 2023 submission to CBP, BBM admitted that one

of its employees created and submitted numerous fraudulent documents and correspondence to the

State Department and created a Fraudulent Export License. *Id.* ¶¶ 45–46. PACEM Defense then

learned that BBM was under criminal investigation by the office of Homeland Security

Investigations or "HSI" which is the Department of Homeland Security's "principal investigative

arm . . . responsible for investigating transnational crime and threats[.]" *Id.* ¶¶ 54–55 (citation

omitted). PACEM Defense understands that BBM remains subject to criminal investigation by

HSI, as well as subject to a compliance review and/or investigation by the State Department.

      Upon learning of BBM's fraudulent conduct, PACEM Defense immediately ceased further

performance under the BBM Agreement. *Id.* ¶ 36. Despite ceasing performance, PACEM Defense

continued to manufacture grenades in the hope that it could find a way to furnish the grenades to

the Ukraine National Police. *Id*. ¶ 39, 51. As of December 1, 2023, PACEM Defense had the next

four shipments of grenades (just over ███ grenades) in inventory available for shipment to the Ukraine National Police as well as additional raw material on hand to produce more grenades. *Id.* ¶ 51. However, because BBM did not then have and never did have the required export approvals, PACEM Defense had no means by which it could lawfully export the additional grenades overseas. *Id.* ¶ 52.

### C.   PACEM Defense Attempts To Salvage The Deal By Entering Into A Replacement Contract With DSS.

After the first shipment was seized, DSS and PACEM Defense began to discuss plans to enter into a new or "replacement" agreement as an attempt to salvage the deal and deliver grenades to the Ukraine National Police without BBM involvement. Under this replacement agreement, instead of BBM acting as exporter, PACEM Defense would obtain the necessary export approvals from the State Department to ship the remaining ███ grenades (shipments two through eight) overseas to DSS, who would then deliver the shipments to the Ukraine National Police. *Id.* ¶ 57. Before signing any contract, PACEM Defense made clear that it would only agree to enter into a replacement transaction with DSS on the condition that BBM would not be involved. *Id.* ¶¶ 58–59. In conversations about the eventual replacement agreement, and weeks before PACEM Defense signed the contract, DSS CEO Ondrej Štěpánek told Brian Crouch of PACEM Defense that BBM would not be participating in the transaction. *Id.* ¶¶ 60–63.

In reliance on DSS's express assurances that BBM would not be participating, on December 12, 2023, PACEM Defense CEO Andrew Knaggs executed a "Sale & Purchase of Goods Agreement" with DSS under which PACEM Defense agreed to manufacture and export the remaining shipments of grenades (*i.e.* shipments two through eight) contemplated by the BBM Agreement to DSS, who would then furnish the munitions to the same foreign end-user, the Ukraine National Police (the "DSS Agreement"). *Id.* ¶ 64. Knaggs signed the DSS Agreement on

behalf of PACEM Defense, with the express understanding from DSS that BBM would not be involved. *Id.* ¶ 65. DSS countersigned on December 18, 2023. *Id.* ¶ 68.

Under the DSS Agreement, DSS has paid a total of $██████ to PACEM Defense. On December 19, 2023, DSS wired PACEM Defense $██████ to cover the remaining amount owed on shipments two through four totaling ████ grenades. Ans., ECF 68, ¶¶ 24, 102. DSS subsequently wired an additional $██████ to pay off the remaining balance on shipment five. *Id*. ¶ 129. Having received the initial 50% deposit from BBM and the remaining 50% balance from DSS, PACEM Defense was paid in full for shipments two through five and PACEM Defense began to prepare the grenades for shipment. However, because PACEM Defense was shipping the grenades to DSS, a foreign entity, PACEM Defense was required—both under federal law and under the DSS Agreement—to obtain the necessary export approvals before it could ship the grenades overseas. *Id*. ¶ 69. Under the contract, obtaining export approval was a condition precedent to PACEM Defense's obligation to ship grenades to DSS. *Id.* ¶ 70.

On January 2, 2024, PACEM Defense submitted its application for an export license or DSP-5, identifying DSS as the "Foreign Consignee" and the Ukraine National Police as the foreign end user. *Id.* ¶ 73. In light of DSS's assurances that BBM would not be participating, PACEM Defense's application did not mention BBM. *Id.* ¶ 74. After receiving PACEM Defense's DSP-5 application, a representative from State Department's DDTC called PACEM Defense's Brian Crouch to ask whether BBM would be participating in the transaction reflected in the DSP-5 application. *Id.* ¶ 75. In reliance on DSS's express representations that BBM would not be involved, PACEM Defense informed the State Department that BBM was not and would not be participating. *Id.* ¶ 76. On January 22, 2024, the State Department approved PACEM Defense's application for an export license. *Id.* ¶ 77.

**D.      DSS Deprives PACEM Defense Of The Benefit Of The DSS Agreement.**

After PACEM Defense represented to the State Department that BBM would not be involved in reliance on DSS's assurances, and after the State Department approved the export application in reliance on PACEM Defense's representations that BBM was not involved, DSS revealed that BBM was and had been involved in the parties' transaction. *Id*. ¶¶ 83–89. On January 30, 2024, eight days after the DSP-5 application for export license was approved, PACEM Defense learned for the first time that DSS had lied, that BBM was a DSS "partner," and that DSS was "assisting" in the parties' transaction. *Id.* ¶¶ 84–85. Days later PACEM Defense received two letters, one from DSS and one from the Czech Ministry of Defense, confirming that BBM had been involved in the transaction unbeknownst to PACEM Defense and contrary to PACEM Defense's representations to the State Department. *Id.* ¶¶ 93–96.

Because DSS misrepresented to PACEM Defense that BBM was not participating in the transaction, PACEM Defense's own various representations to the State Department that BBM was not involved in the transaction—both in its January 2, 2024 application for DSP-5 and subsequent conversations with the State Department—were inaccurate. PACEM Defense was unwilling to export grenades under the previously issued DSP-5 because it was concerned that the State Department would view the DSP-5 as having been obtained through material misstatements and/or omissions. *Id.* ¶¶ 97, 106–07. PACEM Defense contacted the State Department to disclose what had transpired and to receive guidance on whether and how the parties could move forward with the transaction. *Id.* ¶¶ 98–101. Following these conversations with the State Department, DSS agreed that PACEM Defense would make a remedial submission to the State Department in the hopes that the State Department would approve the transaction. *Id.* ¶ 102. On February 23, 2024, PACEM Defense submitted to the State Department an Amendment to Form DSP-5, or DSP-6, "out of an abundance of caution" explaining that "when PACEM Defense submitted its DSP-5

application on January 2, 2024, it had been assured that Battle Born Munitions (BBM) was not involved" but has since learned that BBM was involved. *Id.* ¶ 104.

The State Department never confirmed that PACEM Defense could export the grenades to DSS under the previously issued DSP-5 notwithstanding BBM's involvement. Rather, the State Department later confirmed that the January 22, 2024, DSP-5 was no longer valid as a result of BBM's previously undisclosed involvement. *Id.* ¶¶ 135–40. The State Department also never approved the DSP-6 amending the DSP-5 but rather returned the DSP-6 "without action." *Id.* ¶ 141. Without confirmation from the State Department that PACEM Defense had the required export approvals, PACEM Defense could not lawfully export grenades overseas to DSS. *Id.* ¶¶ 110, 136, 138, 146. Moreover, without export approval, PACEM Defense had no obligation to ship grenades under the DSS Agreement which expressly stated that delivery was "contingent upon export approval." *Id.* ¶ 142. By misrepresenting to PACEM Defense that BBM was not participating in the transaction, DSS prevented PACEM Defense from obtaining the required export approval which, in turn, prevented PACEM Defense from shipping grenades to DSS under the DSS Agreement. *Id.* ¶ 147. As a result, PACEM Defense was deprived of the benefit of the DSS Agreement and suffered damages in the form of lost profits under the Agreement had PACEM Defense's performance not been prevented. *Id.* ¶ 148.

**E.    PACEM Defense Works To Fulfill Its Contractual Obligations And Avoid The Harm Caused By DSS.**

Without the required export approvals to ship grenades to DSS, PACEM Defense was placed in a difficult logistical position regarding what to do with shipments two through five under DSS Agreement. *Id.* ¶ 123. PACEM Defense has limited storage capacity for the energetics required to build the grenades and for finished grenades. *Id.* ¶ 124. In addition to the DSS Agreement, PACEM Defense had an additional fully funded contract with Spetstechnoexport

(STE) for the same type of grenade. *Id.* ¶ 125. That contract was scheduled for production once production under the BBM Agreement completed. *Id.* ¶ 126. BBM's illegal conduct disrupted that planned shipping schedule, and as a result, PACEM Defense needed to lease additional space to store completed grenades. *Id.* ¶ 127. But with the replacement DSS Agreement, PACEM Defense was in a position to manage those storage issues by shipping the grenades manufactured for the BBM Agreement to DSS under the replacement DSS Agreement—provided regulatory approval was forthcoming. *Id.* ¶ 128. Because of DSS's misrepresentations regarding BBM, however, valid regulatory approval was uncertain and PACEM Defense required additional storage space to store shipments two through five under the DSS Agreement. ¶¶ 129–30. The lease for that additional storage space was set to expire on March 31, 2024. *Id.* ¶ 131. Given the stalled regulatory approval, PACEM Defense was then faced with the decision to either shut down production entirely resulting in a default on the STE contract or ship to STE grenades awaiting shipment to DSS. *Id.* ¶¶ 132–33. PACEM Defense chose to ship grenades to STE to avoid default and to prevent PACEM Defense from incurring additional storage costs. *Id.* ¶ 134.

## LEGAL STANDARD

In ruling upon a motion to dismiss, the reviewing court determines whether the allegations in the complaint "are sufficient to state a claim to relief that is plausible on its face and enough to raise a right to relief above the speculative level." *Feld v. United States*, No. 1:23-CV-00840, 2024 WL 457777, at *2 (E.D. Va. Feb. 5, 2024) (Nachmanoff, J.).[1] "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Scratch Golf, LLC v. Beaufort Cnty.*, No. 21-2284, 2024 WL 575370, at *1 (4th Cir. Feb. 13, 2024). Moreover, "[w]hen considering a motion under

---

[1] Unless otherwise indicated, internal quotation marks and citations omitted throughout.

Rule 12(b)(6), the [c]ourt must accept as true all of the factual allegations contained in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Thompson v. Alfred St. Baptist Church*, No. 1:24-CV-00980, 2024 WL 4806267, at *3 (E.D. Va. Nov. 15, 2024) (Nachmanoff, J.). Ultimately, the court must determine "whether, viewed in the light most favorable to the plaintiff, [the allegations] plausibly give rise to an entitlement to relief." *E. Claiborne Robins Co. v. Teva Pharm. Indus. Ltd.*, No. 3:18-CV-00827, 2020 WL 5749936, at *7 (E.D. Va. Sept. 25, 2020).

## ARGUMENT

### I.    PACEM Defense Has Plausibly Alleged Standalone Counterclaims Seeking Damages Caused By DSS, Not Merely Affirmative Defenses.

DSS's primary argument is that both the fraudulent inducement and breach of contract counterclaims fail to allege damages. Mot. 4–5 (fraudulent inducement); *id.* 7–8 (breach of contract). But the careful, straightforward allegations describe how DSS's conduct caused PACEM Defense harm, to include benefit-of-the-bargain damages, and none of DSS's cases support granting DSS's Motion. Instead, what DSS appears to be arguing is that the counterclaims are instead merely defenses because PACEM Defense has not pleaded an *amount* of harm that is greater than $▮▮▮▮▮▮—a number far greater than the money DSS has paid to PACEM Defense. In any event, neither factual allegations nor the law support dismissing PACEM Defense's counterclaims based on DSS's novel not-enough-harm-alleged theory of pleading counterclaims.

### A.    PACEM Defense Has Plausibly Alleged Harm.

All the law requires is that PACEM Defense allege harm that is linked to the alleged fraud or breach of contract. *See Cars Unlimited II, Inc. v. Nat'l Motor Co.*, 472 F. Supp. 2d 740, 747 (E.D. Va. 2007) (holding a fraud counterclaim plausibly alleged damages where it alleged false statements that induced the counterclaimant to enter an agreement, resulting in damages);

9

*Empower AI, Inc. v. Dillahay*, No. 1:24-CV-00083, 2024 WL 4351437, at *8 (E.D. Va. Sept. 30, 2024) (reading the plaintiff's allegations as a whole and finding that plaintiff plausibly alleged contract damages). That is precisely what PACEM Defense has done here.

For each counterclaim, PACEM Defense alleges, in relevant part, that DSS's conduct induced PACEM Defense to enter the DSS Agreement, Countercls. ¶¶ 58–66, and materially contributed to the State Department's failure to issue valid regulatory approval, *id*. ¶¶ 6, 7, 73–78, 97, 129, 135–38, 140–41, 144–45, 147, 150–51, 154, 167–70, 176–77. Because PACEM Defense did not receive that valid approval, it was neither lawfully permitted to ship grenades to DSS, nor contractually obligated to ship grenades to DSS, *id.* ¶¶ 69–71, 137–39,142–47, 171. Because PACEM Defense could not fully perform on the DSS Agreement, PACEM Defense incurred costs and was denied the benefits it would have received had it been able to fully perform on the DSS Agreement, *id.* ¶¶ 123–31, 148, 172, 178. PACEM Defense therefore seeks damages to include lost profits, costs, punitive damages, interest, and attorneys' fees, stemming from DSS's fraudulent conduct and breach of its contractual obligations.

None of DSS's cases, Mot. 4–5, 7–8 (Parts. I.A and II.A), support holding that PACEM Defense has failed plausibly to allege harm. *Paragon Def. Sols., Inc. v. Jadcap Mach. Works, Inc.*, No. 1:22-CV-01425, 2023 WL 4937393, at *2 (E.D. Va. July 10, 2023), states the standard for fraudulent inducement; it does not address whether a plaintiff has plausibly alleged damages. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 616 (E.D. Va. 2005) dismissed fraud claims that alleged speculative damages that "may occur should these defendants use the information they acquired." Here, by contrast, PACEM Defense alleges that it *has already* suffered harm as a result of DSS's conduct. In *Creech v. Everbank*, 467 F.Supp.3d 425, 433 (E.D. Va. 2020), the plaintiff failed to include *any* allegations that it suffered damage, instead alleging that defendant failed to

satisfy a technical "in-person meeting" requirement in a Fair Housing Act (FHA) regulation incorporated in the parties' contract. PACEM Defense has alleged that DSS's conduct caused it harm. Countercls. ¶¶ 154, 172, 178.

DSS also relies on two cases reviewing final determinations on the merits—not addressing motions to dismiss. In *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 136, 156 (Va. 2009), the Virginia Supreme Court *reversed a jury verdict* in favor of plaintiffs where plaintiffs presented evidence of what they paid, not evidence of how they were harmed. *Id.* at 156. *Sunrise* could only become relevant if, at summary judgment or at trial, DSS demonstrates that PACEM Defense has not proved, or cannot prove, any categories of damages sought. *Beatley v. Ayers*, 851 F. App'x 332 (4th Cir. 2021), is an appeal of a *bench trial*, that does not discuss whether a plaintiff plausibly alleged, or sufficiently proved, an entitlement to damages.[2] Moreover, as discussed below, the details of that case, to the extent relevant, actually support denying DSS's Motion.

In sum, PACEM Defense has plausibly alleged harm, and none of DSS's cases weigh in favor of finding otherwise.

### B.    PACEM Defense's Counterclaims Are Properly So Designated And, If Not, Should Be Redesignated As Defenses Only After Discovery Is Complete.

What DSS ultimately argues is not that PACEM Defense has failed to allege harm but failed to allege *enough* harm. DSS claims that, because PACEM Defense has received $█████████ but

---

[2] DSS also cites two factually irrelevant cases—neither of which discusses pleading or proving damages—in support of its erroneous request that the Court dismiss the Counterclaims with prejudice. Mot. 5–6, 8. *Moore v. Equitrans, L.P.*, 818 Fed. App'x 212, 218–19 (4th Cir. 2020), which applies West Virginia law, rules the wrong way for DSS; the court *reversed* a denial of leave to amend. *Wood v. Southside Physician Network, LLC*, No. 3:19-CV-00144, 2019 WL 3416665, at *11 n.5 (E.D. Va. July 29, 2019), merely states that claims should be dismissed with prejudice when amendment is futile, and dismissed claims with prejudice where the plaintiff's dissimilar contract and fraud claims were legally impossible, because he could not plausibly allege liability for a defendant hospital's agent and could not allege fraud where he was arguing, in essence, about which version of a contract applied.

has not shipped grenades to DSS, whatever harm PACEM Defense claims to suffer does not exceed $███████. Mot. 5, 8. This argument is factually and legally mistaken.

### 1.    DSS Misleadingly Obscures The Amount Allegedly At Stake.

DSS is conspicuously careful not to argue that *DSS* provided $███████ to PACEM Defense. That is because *BBM provided most of that money*—specifically, $███████, which it provided in connection with the BBM Agreement. Countercls. ¶¶ 24, 27.[3] DSS instead pleads, and PACEM Defense agrees, that DSS provided PACEM Defense with $███████, FAC, ECF 42, ¶¶ 24, 102, 103; Ans. ¶¶ 24, 26, 102.

Contrary to DSS's arguments, PACEM Defense is not "significantly better off" because it "sold at least some of the Grenades to Spetstechnoexport [STE]." Mot. 5. As the Counterclaims explain, PACEM Defense had limited storage capacity, taken up by the grenades manufactured for BBM. Countercls. ¶¶ 127–30. Had PACEM Defense waited for valid regulatory approval, it would not have been able to manufacture and store grenades needed to fulfill the STE contract. *Id.* ¶¶ 132, 133. PACEM Defense fulfilled that separate STE contract using the fungible grenades, *id.* ¶ 134, which avoided breaching that other agreement.  PACEM Defense may have avoided even greater damages resulting from DSS's conduct, but it is not affirmatively "better off" because it conducted its business by fulfilling a separate contract.

### 2.    Governing Law Supports Designating The Counterclaims As Counterclaims.

DSS never offers a legal basis for its not-enough-harm-alleged argument for dismissal, but

---

[3] These payments represented a deposit on shipments one through eight and full payment for shipment one, Countercls. ¶¶ 24, 27, which is reflected in the Acknowledgment attached to the First Amended Complaint. ECF 42-2. PACEM Defense made the first shipment, contrary to DSS's assertion that PACEM defense "provided nothing," Mot. 5, but because BBM falsely stated that it received valid regulatory approval, the shipment was seized.

rather alludes to it with a cursory statement that "[a]t best, PACEM's 'counterclaims' are defenses …" Mot. 1. This drive-by characterization must first be explained before the legal argument it suggests can be rejected.

Certain precedents, which DSS does not cite, discuss whether a counterclaim seeking damages related to the same transaction should be pleaded as an affirmative defense of "recoupment" or as a standalone counterclaim. *See, e.g.*, *XL Specialty Ins. Co. v. Truland*, No. 1:14-CV-01058, 2015 WL 925595, at *3 (E.D. Va. Mar. 3, 2015) (holding a counterclaim for recoupment to be an affirmative defense); *CMF Virginia Land, L.P. v. Brinson*, 806 F. Supp. 90, 93 (E.D. Va. 1992) (same). This formal labeling issue can become substantive in scenarios *not present here*—for example, where an affirmative defense might avoid a statute of limitation (but a counterclaim would not), *e.g.*, *Manotas v. Ocwen Loan Servicing*, LLC, 794 F. App'x 259, 265 (4th Cir. 2019), or when, before trial, parties are realigned according to their respective burdens of proof, *e.g.*, *CMF Virginia Land*, 806 F. Supp. at 93.

Some courts hold that "recoupment is more properly a counter-claim rather than an equitable defense." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, No. CIVA 03-8554, 2008 WL 465169, at *8 (S.D.N.Y. Feb. 6, 2008), *aff'd*, 347 F. App'x 672 (2d Cir. 2009); *see Glob. Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*, 632 F. Supp. 2d 224, 232 (W.D.N.Y. 2009) ("There is authority, however, "that 'both set-offs and recoupments are to be pleaded as counterclaims rather than affirmative defenses.'"); *see also Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 518 F. App'x 178, 179 (4th Cir. 2013) (discussing "a counterclaim seeking recoupment"). Indeed, some courts have referred to recoupment as a compulsory counterclaim. *Vaughan v. Recall Total Info. Mgmt., Inc.*, 217 F. App'x 211, 223 (4th Cir. 2007).

Other cases appear to suggest that courts should assess (1) whether the amount sought in

recoupment merely seeks a credit, on the same transaction, against what the plaintiff alleges it is owed and (2) whether, if the plaintiff were to prevail or voluntarily dismiss its claims, the counterclaim would remain live, not moot. *Ross v. Indep. Ord. of Foresters*, No. 4:23-CV-00064, 2024 WL 2294876, at *2–*3 (E.D. Va. Feb. 12, 2024) (denying a motion to dismiss a counterclaim); *XL Specialty*, 2015 WL 925595, at *3.

How to label these claims for damages—whether a defense or counterclaim—is often unclear. *See* 6 Fed. Prac. & Proc. Civ. § 1407 (3d ed). "When in doubt, therefore, ***the pleader always is advised to characterize the material as a counterclaim***." *Id.* (emphasis added). Fortunately, the Federal Rules of Civil Procedure provide a mechanism for resolving this labeling issue. Rule 8(c)(2) provides: "If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." *CMF Virginia Land*, 806 F. Supp. at 93.

PACEM Defense has properly designated its fraud and breach of contract claims as counterclaims. As an initial matter, caselaw supports holding that allegations sounding in "recoupment" should be alleged as counterclaims. *Exp.-Imp. Bank of U.S.*, 2008 WL 465169, at *8; *Farkas*, 518 F. App'x at 179. But in any event, the counterclaims do not meet the apparent standard for redesignation as affirmative defenses for several reasons. *See Ross*, 2024 WL 2294876, at *2–*3; *XL Specialty*, 2015 WL 925595, at *3.

***First***, the amounts at issue are not certain. *Contra XL Specialty*, 2015 WL 925595, at *3. DSS alleges that it provided $████████ to PACEM Defense. FAC ¶¶ 24, 102, 103. In full disclosure, and although the pleadings do not contain this precise figure, PACEM Defense represents that DSS actually provided approximately $████████ PACEM Defense's damages caused by DSS's conduct could plausibly exceed $████████ when considering lost profits on all

14

of shipments two through eight together with costs, interest, and punitive damages. PACEM Defense has not identified any authority suggesting that the parties must precisely calculate their damages, at the pleadings stage, to determine whether counterclaims seek amounts that exceed any amounts plaintiff claims—nor would such a factual inquiry be appropriate on a motion to dismiss.

*Second*, if DSS dropped its claims, PACEM Defense would still have an independent claim against DSS for the harm it has caused. *See Ross*, 2024 WL 2294876, at *3. This is because the money's actual source has not been established. In the re-designation cases previously discussed, there was only *one* initial claimant. *Ross*, 2024 WL 2294876, at *2–*3; *XL Specialty*, 2015 WL 925595, at *3. Here, there are *three* potential claimants for the money PACEM Defense has received—DSS, BBM, and the Ukrainian government. PACEM Defense disputes that BBM or the Ukrainian National Police have plausible claims, but the factual record is not sufficiently developed to determine whether either *could* assert a claim to any money PACEM Defense has received. Were DSS to drop its claims, and another entity seek to recover from PACEM Defense, PACEM Defense would still have independent claims against DSS for the harm it caused related to the DSS Agreement. *See Ross*, 2024 WL 2294876, at *3 ("[I]f the plaintiff were to prevail, or even voluntarily dismiss her claim, the defendant's counterclaim would remain live—not moot.").

*Third*, DSS's claims for relief do not subsume PACEM Defense's claims. DSS has asserted claims for equitable relief, to include recission and specific performance. Were DSS awarded equitable relief, PACEM Defense would still have a claim for damages separate from that relief. *Cf. Farkas*, 518 F. App'x at 179 (addressing "a counterclaim seeking recoupment" brought in response to claims for equitable relief). Accordingly, for this additional reason, PACEM Defense's counterclaim is independent of the relief DSS seeks. *Ross*, 2024 WL 2294876, at *3.

*Fourth*, *Beatley v. Ayers*, 851 F. App'x 332 (4th Cir. 2021), cited by DSS, while not about

15

characterizing defenses and counterclaims, supports finding that PACEM Defenses counterclaims are correctly designated. That case concerned two defaults—one on an obligation for payment and the other on an obligation to assume a loan. The Fourth Circuit held that plaintiff's breach of contract claim was satisfied because defendant paid the amount owed, with interest, *and* evidence showed that payment extinguished the claim because other parties were not seeking to collect from plaintiff on a default loan. *Beatley*, 851 F. App'x at 337. Here, as discussed below, PACEM Defense has not been paid, or credited, the amount of its breach of contract damages *and* has not received legally enforceable assurances that DSS is the only party who could seek to collect on the money PACEM Defense has received. *Beatley* additionally held that, even though the plaintiff's breach of contract claim had been satisfied, "the fraud claim permits [plaintiff] to seek a broader range of damages than available on his contract claim," to include "out-of-pocket expenses, lost profits, punitive damages, and attorney's fees." *Id*. at 338. Accordingly, the plaintiff was entitled to seek damages on its fraud claim even where it had received contract damages. So too here, even if PACEM Defense's contract damage claim is satisfied, in some way, the fraud counterclaim asserts additional damages that PACEM Defense should have an opportunity to prove.

***Regardless***, if the evidence ultimately shows that PACEM Defense's counterclaims should be redesignated as defenses, the Court must do so "if just requires." Fed. Civ. R. P. 8(c). The appropriate time to do that, under these circumstances, would be after making sufficient evidentiary findings to conclude that these counterclaims are mis-designated, either at summary judgment or before trial. Based on the pleadings as they now stand, there is no valid basis to do so, and DSS's Motion should be denied.

## II. DSS's Secondary Arguments Fail.

DSS tacks on additional arguments regarding both counterclaims that either ask the Court to ignore well-pleaded factual allegations (while improperly drawing inferences in DSS's favor)

or misapply the law. The Court should reject these arguments and deny DSS's Motion.

### A.    DSS's Attempt To Rehabilitate Its Fraudulent Misstatements Is Illogical And Relies On Improper Inferences In Its Favor.

DSS argues that the counterclaims fail to plausibly allege that its pre-execution statements—that federal investigations-target BBM was not participating in the transaction—could not have been "false when made." Mot. 8. But the counterclaim's allegations, described in detail above, provide a straightforward, plausible allegation of DSS's false statements, and DSS's gloss should be rejected.

The counterclaims plausibly allege that, before signing the DSS Agreement on December 12, 2023, PACEM Defense asked DSS to confirm that BBM would not be participating in the transaction. Countercls. ¶¶ 57–63. DSS responded that BBM would not be participating. *Id*. This was critical for PACEM Defense because BBM was under multiple federal investigations—and may still be—for its conduct leading to the first shipment's seizure. *Id*. ¶¶ 54–56. DSS knew, or should have known, that PACEM Defense would not proceed with the DSS Agreement if BBM were also participating. *Id*. ¶¶ 58–59. Materially relying on DSS's reassurances that BBM was not participating, PACEM Defense entered into the DSS Agreement on December 12, 2023. *Id*. ¶¶ 64–66. Later, on January 30, 2024, DSS revealed in a text message, perhaps inadvertently, that "[a]s for BBM I insist to have them on the call as they are DSS partners and assisting with this [PACEM Defense] project." *Id*. ¶ 85. After PACEM Defense explained its concern with DSS's disclosure, both DSS and the Czech Ministry of Defense stated in writing, in February 2024, that BBM was "no longer" associated with the transaction. *Id*. ¶¶ 93–95. The fact that DSS confirmed, in writing, in February 2024, that BBM was *no longer* participating demonstrates that BBM was, in fact, *previously* participating—contrary to DSS's December 2023 assurances. *Id*. ¶¶ 93, 95.

DSS asserts that these straightforward allegations are "replete with inconsistencies and

contradictions," but the lone example DSS offers is no contradiction at all. Mot. 7. According to DSS, it could not have made a misstatement *in December 2023*, when it stated that BBM was *not* participating, because why else, per DSS, would it later let slip, in an off-handed January 2024 text message, that BBM *was* participating in the transaction. As DSS argues, "if DSS wanted BBM's purported role to be kept a secret, and if it had falsely represented to PACEM that BBM was not involved, it would not have voluntarily disclosed that role." Mot. 7.

This argument is wrong for two reasons. ***First***, DSS, in effect, asks the Court to infer that DSS *could not have* made the initial false statements. Not only are inferences against PACEM Defense, and in DSS's favor, improper at this initial pleading stage, so too are arguments that ask the Court to ignore well-pleaded allegations that DSS did make those statements.[4] *See Thompson*, 2024 WL 4806267, at *3 (holding a court "must accept as true all of the factual allegations contained in the complaint and must draw all reasonable inferences in favor of the plaintiff"—in the matter at hand, in favor of the counterclaimant, PACEM Defense).

***Second***, DSS's argument defies logic. That a misstatement is later revealed to have been false does not make the initial misstatement somehow true. According to DSS's strained argument, the Court should conclude, as a matter of law, that someone could not make a false statement if they later tell the truth—intentionally or inadvertently. The natural implication is that a company that finally "comes clean" about prior misstatements or omissions could not face a valid securities lawsuit, consumer protection claims, or fraud prosecution because a misrepresentation can be immunized by a later disclosure. The Court should reject DSS's illogical argument.

---

[4] Although DSS inserts a drive-by characterization that the Counterclaims are "vague[] and without specificity" and "fail[] to provide any details," DSS's litigation position is otherwise, as DSS has not moved to dismiss the fraud counteclaim for failing to provide the specificity required by Federal Rule of Civil Procedure 9(b).

In all events, whether DSS misstated BBM's participation in the transaction before PACEM Defense executed the DSS Agreement is a question for the trier of fact. At this stage, because there are no inconsistent, let alone contradictory, allegations, PACEM Defense has plausibly alleged that DSS's December 2023 statements that BBM was not participating were false when made.

**B.    DSS's Effort To Defeat The Breach Of Contract Counterclaim Distorts The Law And The Facts.**

The breach of contract counterclaim alleges that DSS is liable under either the prevention doctrine or for breaching the duty of good faith and fair dealing. Countercls. ¶¶ 155–78. DSS does not discuss the prevention doctrine. Instead, DSS argues that PACEM Defense must allege that DSS breached a specific contract provision, Mot. 8–9, that the duty of good faith and fair dealing cannot create such a provision, Mot. 9–10, and that the Counterclaim's allegations are "implausible, if not impossible," Mot. 10–11. All of these arguments fail.

**1.    PACEM Defense has plausibly alleged that DSS breached its contractual duties.**

PACEM Defense's well-pleaded breach of contract claim is straightforward and seeks recovery based on the related concepts of the prevention doctrine and breach of the duty of good faith and fair dealing.[5]

***Relevant background allegations***. As described in detail above, the DSS Agreement

---

[5] The related concepts often travel together. *See* Calamari & Perillo on Contracts (5th ed) § 11.38(a) ("The rules relating to the duty not to prevent the other party's compliance with conditions are emanations of the duty of good faith.") For example, in one case, plaintiff presented both breach-of-contract theories to the jury, which found in plaintiffs' favor on both. *See Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, No. 7:16-CV-00489, 2020 WL 929580, at *3 (W.D. Va. Feb. 26, 2020), *aff'd* 3 F.4th 605 (4th Cir. 2020). Other cases also discuss the concepts together. *See, e.g.*, *Cox v. SNAP, Inc.*, 859 F.3d 304, 309 (4th Cir. 2017) (discussing the concepts together); *L3Harris Mar. Servs., Inc. v. BAE Sys. Norfolk Ship Repair Inc.*, No. 2:23-CV-00259, 2024 WL 4642961, at *46–*48 (E.D. Va. Oct. 30, 2024) (discussing both theories, which were raised by plaintiffs); *Connect IT Sols., Inc. v. Fidelis Cybersecurity, Inc.*, No. 1:17-CV-01306, 2019 WL 8112895, at *4 (E.D. Va. Jan. 28, 2019) (same).

requires PACEM Defense to secure valid regulatory approval before shipping grenades to DSS. In attempting to secure that approval, PACEM Defense relied on DSS's reassurances that BBM was not participating in the transactions. On January 2, 2024, PACEM Defense filed a Form DSP-5 that did not list BBM as a participating entity. Countercls. ¶¶ 73–74. After receiving that Form DSP-5, the State Department asked whether or not BBM was participating, and PACEM Defense confirmed that BBM was not participating. *Id.* ¶¶ 75–76. On January 22, 2024, the State Department approved the DSP-5. *Id.* ¶ 77.

But that "approval" was critically impaired. Eight days later, on January 30, 2024, DSS revealed that BBM was, in fact, its "partner" in the transaction. *Id.* ¶ 84. Although both DSS and the Czech Ministry of Defense stated that BBM was "no longer" participating, these two statements show that BBM *was* previously participating—including at the time PACEM Defense unwittingly relayed, to the State Department, DSS's false statements that BBM was *not* participating. *Id.* ¶¶ 93–96. PACEM Defense was rightly concerned that the State Department would view the DSP-5 as having been obtained through material misstatements and/or omissions, precisely the offense of which BBM stands accused in presumably ongoing investigations. PACEM Defense therefore did not consider the issued Form DSP-5 to be valid regulatory approval.

PACEM Defense nevertheless tried to fix the regulatory roadblocks DSS created. *Id.* ¶¶ 98–104. But PACEM Defense never received the regulatory clarity necessary to proceed on an impaired regulatory approval. *Id.* ¶¶ 138–41. Because of DSS's conduct, PACEM Defense could not secure valid regulatory approval, and therefore could not legally, and did not, ship grenades to DSS. Because PACEM Defense could not further perform on the DSS Agreement, by shipping grenades to DSS, PACEM Defense was deprived of the benefit of its bargain under the DSS Agreement.

*Prevention doctrine*. PACEM Defense alleges that DSS prevented PACEM Defense from realizing the benefit of its bargain by materially contributing to PACEM Defense's failure to receive required export approval. *Id.* ¶¶ 170–72. Under these facts, PACEM Defense seeks recovery under the prevention doctrine, which provides that, where a contractual counterparty, like DSS, contributes materially to the non-occurrence of a condition, the other, PACEM Defense, is both excused from performance and may seek contract damages.

The prevention doctrine is described generally in secondary sources. "Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him under § 205 may require some cooperation on his part, ***either by refraining from conduct that will prevent or hinder the occurrence of that condition*** or by taking affirmative steps to cause its occurrence." Restatement (Second) of Contracts § 245 (1981); *see also id.* at illustration 4 (discussing regulatory approval). "Two results followed from the wrongful prevention of the defendant [here, DSS]. First, plaintiff [here, PACEM Defense] was excused from the inability to convey because of the wrongful prevention, and second, since an affirmative obligation had been violated, plaintiff was entitled to damages." Calamari & Perillo on Contracts (5th ed) § 11.28 ("Prevention, Hindrance, or Failure to Cooperate"). "The doctrine of prevention is also related to the rule that repudiation may constitute an excuse for nonperformance, in that one party's actions preventing or interfering with performance by the other party may be found to amount to a refusal to perform, such that ***the party interfered with may recover as if the contract had been performed***." 13 Williston on Contracts § 39:7 (4th ed.). (emphasis added). *See also Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 CV. 0432, 2009 WL 3124219, at *5–*6 (S.D.N.Y. Sept. 29, 2009) (discussing the prevention doctrine under New York law in the context of an allegation that a contract counterparty materially hindered regulatory approval).

The Virginia Supreme Court has discussed and applied the doctrine. *See generally Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Est. Co., LLC*, 806 S.E.2d 740, 745–46 (Va. 2017) (citing *Boggs v. Duncan*, 121 S.E.2d 359, 363 (Va. 1961), and *R.G. Pope Const. Co. v. Guard Rail of Roanoke, Inc.*, 244 S.E.2d 774, 780 (Va. 1978)). *Boggs* and *R.G. Pope* both hold that a defendant sued for breach of contract *can counterclaim for contract damages* where, as here, the plaintiff prevented the defendant's performance. And in both cases, the Virginia Supreme Court affirmed judgments in favor of the counterclaimant. *R.G. Pope*, 244 S.E.2d at 780; *Boggs*, 121 S.E.2d at 363; *see also Rastek*, 806 S.E.2d at 748 (referring to "recovery of damages for the prevention of performance of a condition" and citing *R.G. Pope* and *Boggs*).[6] As *Boggs* explains, "prevention is a breach of the contract by the party so preventing performance and renders him liable to pay damages. The party prevented from performing is at liberty to treat the contract as broken and abandon it ***and recover as damages the profits which he would have received through full performance***. In other words, such party may regard it as terminated and demand whatever damage he has su[s]tained thereby." 121 S.E.2d at 363 (emphasis added). *R.G. Pope* similarly held that that "[the plaintiff] actually unjustifiably prevented [the defendant] from performing its contract by conduct which caused the delay in completion of the project, rendering [the plaintiff] liable to [the defendant] for damages." 244 S.E.2d at 779. Under both *Boggs* and *R.G. Pope*, PACEM Defense has stated a valid counterclaim to recover pursuant to the prevention doctrine.

***Duty of good faith and fair dealing***. PACEM also alleges that DSS breached its duty of good faith and fair dealing by failing to refrain from conduct that would prevent PACEM Defense from receiving valid regulatory approval. Countercls. ¶¶ 174–78. Virginia law implies a duty of

---

[6] As *Rastek* explains, the prevention doctrine is also a defense. 806 S.E.2d at 745–46 (quoting *Boggs*, 121 S.E.2d at 362–63).

good faith to all contracts. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 465 (E.D. Va. 2013), *clarified on denial of reconsideration*, No. 2:13-CV-00008, 2013 WL 4539736 (E.D. Va. Aug. 27, 2013). This includes contracts, like the DSS Agreement, governed by Virginia's Uniform Commercial Code, which imposes an obligation of good faith in the performance of the DSS Agreement. Va. Code § 8.1A-304.

The duty of good faith "***prevents a party from*** doing anything that will have the effect of ***injuring or frustrating the right of the other party to receive the fruits of the contract*** between them." *Morris v. Wilmington Sav. Fund Soc'y*, 360 F. Supp. 3d 363, 371 (W.D. Va. 2018) (emphasis added); *see* Restatement (Second) of Contracts § 245 (1981) (Effect of a Breach by Non-Performance as Excusing the Non-Occurrence of a Condition). "The rules relating to the duty not to prevent the other party's compliance with conditions are emanations of the duty of good faith." Calamari & Perillo on Contracts (5th ed) § 11.38(a). And the Virginia Commercial Code defines good faith—for a merchant, like DSS—to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Va. Code § 8.2-103(1)(b); *see also* Restatement (Second) of Contracts § 205 cmt. d (1981) (discussing "good faith performance").

The obligation of good faith and fair dealing applies where express contractual provisions do not. *See* 3 Corbin § 570(A) (Supp. 1998) (explaining the duty of good faith "is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations"). As courts around the country have recognized, the duty is a "gap filler" to require reasonableness and good faith where contracts do not provide for express rights.[7] Virginia law is the same. "[I]t is a basic principle of contract law

---

[7] *See, e.g.*, *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 467 (8th Cir. 2002) "[T]he covenant acts merely as a gap filler to deal with circumstances not contemplated by the parties at

in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998) (emphasis in original).

Section 245 of the Second Restatement, cited approvingly by the Fourth Circuit in cases applying Virginia law, describes how the breach of the duty of good faith and fair dealing applies here.[8] It states, in relevant part: "***the additional duty of good faith and fair dealing***... may require some cooperation ...either by ***refraining from conduct that will prevent or hinder the occurrence of that condition*** or by taking affirmative steps to cause its occurrence." (emphasis added). Illustration four describes how this concept relates to regulatory approval:

> 4. A contracts to sell and B to buy A's rights as one of three lessees under a mining lease in Indian lands. The contract states that it is "***subject only to approval by the Secretary of the Interior***," which is required by statute. B files a request for approval but ***A fails to support B's request*** by giving necessary cooperation. ***Approval is denied*** and A cannot convey his rights. ***B has a claim against A*** for total breach of contract. ***A's breach of his duty of good faith and fair dealing*** contributed materially to the non-occurrence of the condition, approval by the Secretary of the Interior, excusing it.

*Id.* at illustration 4 (emphasis added).

Indeed, the facts here are worse for DSS ("A" in the above example). DSS did not have to

---

the time of contracting. Since good faith is merely a way of effectuating the parties' intent in unforeseen circumstances, the implied covenant has nothing to do with the enforcement of terms actually negotiated and cannot block the use of terms that actually appear in the contract.") (cleaned up); *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1308 (S.D. Fla. 2014) ("In filling the gaps, the implied covenant of good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.").

[8] The Fourth Circuit in *Cox v. SNAP, Inc.*, 859 F.3d 304, 309 (4th Cir. 2017), and *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000), both Virginia law cases, cites and quotes from § 245 of the Second Restatement. Both cases also discuss the prevention doctrine, further demonstrating that the breach of duty of good faith and the prevention doctrine can be closely related concepts.

"support" PACEM Defense's effort to get regulatory approval. DSS just had to "refrain[] from conduct that will prevent or hinder" PACEM Defense's ability to receive regulatory approval. Because DSS did not so refrain, and the State Department did not issue valid regulatory approval— what the State Department did issue was based on DSS's lie—PACEM Defense has a claim against DSS for breach of the duty of good faith and fair dealing.

### 2. DSS's legal arguments all misstate the Counterclaim's allegations.

DSS casts up numerous strawmen in opposition to PACEM Defense's well-pleaded claim. *First*, DSS argues that PACEM Defense has not identified a provision of the contract breached. Mot. 8. This is both true and irrelevant. The duty of good faith and fair dealing does not apply where a specific contract provision governs.[9]

DSS nonetheless doubles down on its crabbed specific-provision-required view of contract breach. It asserts that, because PACEM Defense has not identified a specific contract provision, the breach of contract counterclaim should be dismissed *with prejudice*. Mot. 9. DSS is wrong. Were DSS correct, the duty of good faith and fair dealing would not exist because it does not apply to a claim for breach of a specific provision. If DSS truly believed a specific contract provision were necessary, it would not have briefed the duty of good faith and fair dealing. Mot. 9–10.

Moreover, DSS's cases that purport to require a claimant to identify a specific contract provision breached are beside the point. *Grasso v. Berg*, 113 F.3d 1232, at *1 (4th Cir. 1997) does not address the duty of good faith and fair dealing at all. *In Re Estate of Cook*, Case No. 1:23-CV-00009, 2023 WL 3467209, at *3 (E.D. Va. May 15, 2023), contains an abbreviated discussion of

---

[9] There is one exception: where a defendant exercises a contract right *dishonestly*. *See Mawyer v. Atl. Union Bank*, No. 3:21-CV-00726, 2022 WL 1049311, at *7 (E.D. Va. Apr. 7, 2022); *see also* Va. Code § 8.2-103(1)(b) (defining good faith to include "honesty in fact"). Although DSS acted dishonestly, the breach of contract counterclaim does not allege that DSS did so while exercising any express contract rights.

the doctrine, ultimately holding that the plaintiff failed to allege a breach of the duty for "failing to adequately investigate … suspicious transactions." The case does not stand for DSS's Catch-22 argument that the duty of good faith both applies only where a contract has no applicable provision, and also that a breach of contract claim must identify an applicable contract provision. The Court should reject DSS's efforts to argue the duty of good faith and fair dealing out of Virginia law.

**Second**, DSS asserts that "PACEM appears to be claiming that BBM's non-participation in the transaction between DSS and PACEM was a condition precedent to performance," Mot. 8-9, which DSS then argues, is not a provision of the DSS Agreement. This is not a serious argument. The counterclaims clearly plead that *obtaining regulatory approval* is the relevant condition precedent. Countercls. ¶¶ 70, 143, 146, 147, 157, 159, 160. DSS agrees. It pleads that regulatory approval is required before PACEM Defense ships grenades. FAC ¶ 45. The Court should therefore reject DSS's argument that the counterclaims assert DSS prevented the occurrence of the non-existent no-BBM-participation condition precedent of the DSS Agreement.

**Third**, DSS argues that PACEM Defense is attempting to use duty of good faith and fair dealing to "rewrite an unambiguous contract" to "create out of thin air" a "provision of the Agreement concerning BBM," Mot. 8–9. This is another straw man. PACEM Defense agrees that the DSS Agreement is unambiguous and also agrees that no express provision of the agreement refers to BBM. That is why the breach of contract counterclaim relies on the prevention doctrine and on the duty of good faith and fair dealing—both of which only apply (again) where no specific provision of an agreement was breached. Here, DSS was required by law to *refrain from* conduct that would prevent or hinder PACEM Defense's ability to perform. DSS failed to do so, which is a breach of contract. DSS's colorful rhetoric about being compelled to take affirmative action,

26

undercutting express rights, and establishing independent duties, Mot. 9, is therefore inapt.[10]

**_Fourth_**, DSS argues that PACEM Defense is asserting that DSS "breached a pre-Agreement promise" related to BBM. Mot. 10. Still another strawman. The breach of contract counterclaim does not allege that the "breach" was of a pre-agreement promise—DSS's reassurance that BBM was not participating in the process. The breach was DSS's entire course of conduct that prevented PACEM Defense from being able to secure regulatory approval, further perform on the agreement, and thus enjoy the benefits of its bargain.

**_Finally_**, DSS argues that the counterclaims fail to identify any contractual discretion that DSS exercised in bad faith. The duty of good faith and fair dealing does not only apply where a contract expressly states that a party has discretion. The duty is a "gap filler" that applies where a contract is silent on a particular matter and thus provides the parties with discretion of how to perform. Accordingly, where, as here, there is no specific provision addressing BBM, or the entities with which DSS can partner, DSS had discretion on how to proceed.[11]

---

[10] The cases DSS cites in proximity to this erroneous argument are inapt. *ACA Fin. Guar. Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206, 213–15 (4th Cir. 2019), dismisses a good faith breach allegation that argues the defendant should have taken affirmative action that the contract expressly states the defendant was not required to take. Similarly, *Monton v. Am.'s Servicing Co.*, No. 2:11-CV-00678, 2012 WL 3596519, at *7 (E.D. Va. Aug. 20, 2012), dismissed a good faith breach claim alleging the defendant should have taken conduct contrary to an express contractual right. Here, by contrast, DSS argues—and PACEM Defense agrees—that no express contractual right addressed whether DSS could partner with an entity under federal investigation for recent bad conduct, related to the nearly identical previous transaction that also included PACEM Defense and DSS.

[11] None of the cases DSS cites are to the contrary. Indeed, the discussion in *Coon v. Fed. Nat'l Mortg. Ass'n*, No. 3:18-CV-00108, 2019 WL 2656208, at *6 (E.D. Va. June 27, 2019), *aff'd*, 838 F. App'x 783 (4th Cir. 2021), underscores that claims for duty of the breach of good faith and fair dealing can survive a motion to dismiss where "**_facts support[] a plausible inference that [the defendant] prevented [the plaintiff] from performing her obligations under the contract_**" or where "an affirmative representation by the defendant caused the plaintiff to breach…" (emphasis added). *Mawyer v. Atl. Union Bank*, No. 3:21-CV-00726, 2022 WL 1049311, at *6 (E.D. Va. Apr. 7, 2022), dismisses a bad faith breach claim because, the court ruled, the claim was really based

DSS exercised that discretion in bad faith. It failed to conduct itself with "honesty in fact," by misrepresenting BBM's participation in the transaction, and failed to act commercially reasonably, by partnering with a company then under federal investigation for essentially the same transaction. Va. Code § 8.2-103(1)(b). That conduct "prevent[ed] or hinder[ed] the occurrence of" the precondition—valid regulatory approval—necessary for PACEM Defense to realize the benefit of its bargain. That is a breach of the duty of good faith and fair dealing.

3.    **DSS's factual arguments ignore the allegations and rely on improper inferences.**

As PACEM Defense has stated from the outset: "Ultimately, this is a dispute about whether Pacem was 'too careful' about receiving clear, unclouded approval from U.S. regulators before shipping explosive ordnance to a foreign customer." Def. Mem. ISO Mot. to Dismiss, ECF 15, at 2. This question is for the trier of fact to resolve, after assessing all of the evidence. DSS nonetheless asks the Court to short circuit that factual inquiry by asking the Court to rule *now* that valid regulatory approval existed. The Court should decline DSS's invitation to decide this critical, contested fact issue at the motion to dismiss stage.

*First*, DSS ignores the relevant allegations. Without even acknowledging the relevant chronology, DSS asks the Court to rule that the DSP-5, granted on January 22, 2024, was valid regulatory approval required by the DSS Agreement. Mot. 10. This argument ignores the other allegations that plausibly cast doubt on whether that "approval" was valid—including DSS's false statements, repeated unwittingly by PACEM Defense to the State Department, that BBM was not participating in the transaction (on which the State Department appears to have relied), and DSS's

---

on the interpretation of an express statutory term, and there were no allegations of dishonesty. *Pfahning v. Cap. One Bank (USA), N.A.*, 570 F. Supp. 3d 337, 345 (E.D. Va. 2019), merely rejects a bad faith breach claim where defendant was exercising its contractual rights. Again, here, both DSS and PACEM Defense agree that no provision governs DSS's conduct.

urging that PACEM Defense file a new DSP-5 to disclose BBM's participation. Countercls. ¶ 103. The Counterclaims themselves further explain PACEM Defense's plausibly alleged concern that the January 22 "approval" of the DSP-5 was not valid. Because the Court must consider the Counterclaims as a whole, DSS's blinkered selection of the single allegation it likes—ignoring the other allegations it does not—cannot support dismissal.

**Second**, DSS asks the Court to draw an unreasonable, and likely unlawful, inference in DSS's favor. DSS's argument appears to run as follows. Between the January 22, 2024, "approval" and DSS's January 30, 2024, disclosure, PACEM Defense was not aware that it provided the State Department with DSS-supplied false information regarding BBM's participation before the State Department issued its approval. DSS argues that PACEM Defense could have, and should have, shipped available grenades in that eight-day window—before PACEM Defense learned that DSS caused it to make misstatements to the State Department that needed to be corrected. Mot. 11. This is a breathtaking argument. Not only is this an improper inference to draw at the motion to dismiss stage, but the argument is so outlandish that it should be rejected out of hand.

**Third**, DSS resorts to misstating the allegations. DSS asserts that PACEM Defense "received multiple assurances that BBM would not be involved in the transaction," Mot. 11 (citing Countercls. ¶¶ 91, 93, 95), which DSS also describes as "multiple confirmations that BBM was not involved," Mot. 11. At no point did DSS ever state that BBM was *never* participating in the transaction. Instead, DSS and the Czech Ministry of Defense stated that BBM was *no longer* participating. Countercls. ¶¶ 93, 95. The plain import of both statements is that BBM *had been* participating at the time PACEM Defense made contrary representations (relying on DSS) to the State Department. *Id.* ¶¶ 94, 96. And although DSS's CEO "attempted to disclaim BBM's participation," *id.* ¶ 91, his directly contrary text messages states, "As for BBM I insist to have

29

them on the call as **they are DSS partners and assisting with this** [PACEM Defense] **project**." *Id.* ¶ 85 (emphasis added); *see also* Ans. & Countercls. Ex. E (Jan. 30, 2024, Messages).

DSS then asks the Court to wade into these allegations by imposing its own view that BBM's participation was "pre-performance," thus making it irrelevant to the key question whether the January 22 "approval" was valid. This is a question to be resolved by a trier of fact. PACEM Defense has plausibly alleged that BBM's prior participation in the transaction rendered the January 22, 2024, "approval" to be suspect at best and, more likely, to be entirely invalid. DSS disagrees. That factual disagreement provides no basis to dismiss the plausibly alleged breach of contract counterclaim before the parties have had an opportunity to litigate the issue.

## CONCLUSION

For the foregoing reasons, PACEM Defense respectfully requests that the Court deny DSS's Motion to Dismiss PACEM Defense's Counterclaims.


Dated: March 21, 2025                    Respectfully submitted,

                                         */s/ Philip J. O'Beirne*
                                         Philip J. O'Beirne (Virginia Bar No. 71956)
                                         Michael A. Petrino (Virginia Bar No. 77187)
                                         **STEIN MITCHELL BEATO &**
                                         **MISSNER LLP**
                                         2000 K. Street NW, Suite 600
                                         Washington, DC 20006
                                         (202) 737-7777
                                         pobeirne@steinmitchell.com
                                         mpetrino@steinmitchell.com

                                         *Counsel for Defendant PACEM Defense*
                                         *LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to all CM/ECF participants, including counsel for Plaintiff/Counterclaim Defendant.


*/s/ Philip J. O'Beirne*
Philip J. O'Beirne