UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DSS A.S.,<br>      *Plaintiffs*,<br><br>v.<br><br>PACEM DEFENSE LLC,<br>      *Defendants*. | 1:24-cv-01331-MSN-LRV<br><br>**<u>PUBLIC VERSION</u>** |

### <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Plaintiff and Counterclaim Defendant DSS A.S.'s ("DSS") motion to dismiss Defendant PACEM Defense LLC's ("PACEM") Counterclaim. ECF 76. Because PACEM has not adequately pled damage resulting from DSS's alleged actions, the Court will grant DSS's motion.

**I.      BACKGROUND**

      **A.      Factual Background[1]**

PACEM is a Virginia company in the business of manufacturing, exporting, and coordinating the sale of munitions. ECF 68 ("Ans." or "Counterclaim") ¶ 13. DSS is a Czech company and defense goods importer. *Id.* ¶ 12.

      **1.      Arms Export Approval Requirements**

A United States entity that seeks to export munitions must obtain an export license from the United States Department of State ("State Department"). To do so, the exporter must submit an application to the State Department for a "DSP-5" export authorization, which permits the authorized munitions to pass through U.S. customs. *See* Counterclaim ¶¶ 69-73. If certain changes

---

[1] For the purposes of this motion, the Court accepts as true all factual allegations in PACEM's Counterclaim. *E.l. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

occur subsequent to the submission of a DSP-5 application, an exporter can submit an "Application for Amendment to a DSP-5 License" or "DSP-6" form. *Id.* ¶ 102, Ex. F.

### 2. June 2023 BBM Contract

Prior to entering the contract at issue here, PACEM contracted with another party, Battle Born Munitions, Inc. ("BBM") for the delivery of the same products to the same foreign end-user. Counterclaim ¶ 14. BBM, like DSS, was in the business of procuring defense goods. *Id.* ¶ 15. BBM and PACEM's June 27, 2023 contract ("BBM Agreement") provided that PACEM would ship BBM ▮▮▮▮ grenades in exchange for $▮▮▮▮▮▮, and required BBM to obtain an export license from the State Department prior to shipment. Counterclaim ¶¶ 16, 18, Ex. A. After the contract was executed, BBM informed PACEM that PACEM should ship the munitions to DSS, its Czech business partner, who would then ship the grenades to the end user. *Id.* ¶ 22.

BBM paid an initial deposit of $▮▮▮▮▮▮ to PACEM between June 30, 2023 and July 5, 2023, and made an additional payment of $▮▮▮▮ on September 19, 2023. Counterclaim ¶¶ 24, 27. But the first shipment of grenades was halted by CBP before it left the country because BBM's DSP-5 export approval had been obtained fraudulently based on false statements or omissions of material fact in its DSP-5 application. *Id.* ¶¶ 29-33. BBM had thus lied to PACEM when it represented that it had obtained the necessary State Department approvals for the grenades' shipment. Counterclaim ¶¶ 19-21. Upon receiving notice of the seizure, PACEM ceased further performance under the BBM Agreement. *Id.* ¶ 36.

In November 2023, BBM submitted a filing to CBP in which it admitted that one of its employees "created numerous fraudulent documents and correspondence" and kept "BBM personnel in the dark about [his] failure to properly apply for and obtain the necessary license to export" the grenades. Counterclaim ¶¶ 45-46. PACEM later learned that BBM was under criminal investigation by DHS. *Id.* ¶ 53.

### 3. DSS Contract

On November 6, 2023, following BBM's failure to successfully export the grenades, BBM sought to assign its agreement directly to PACEM. Counterclaim ¶ 42. PACEM insisted that guidance from the State Department be obtained before such an assignment. *Id.* ¶ 43. A State Department representative indicated that he would need to discuss the situation with leadership before providing guidance. *Id.* ¶ 44. After receiving this advice, DSS and PACEM began pursuing an alternate path and entered into negotiations regarding a replacement contract in which PACEM (rather than BBM) would act as the exporter. Counterclaim ¶ 57. As part of the negotiations, DSS agreed that BBM would not participate in the transaction. *Id.* ¶¶ 58-62.

On December 12, 2023 and in reliance on these assurances regarding BBM's participation, PACEM and DSS executed a new sale and purchase agreement ("DSS Agreement"). *Id.* ¶ 64. PACEM signed the agreement "with the express understanding from DSS that BBM would not be involved," and "would not have signed the DSS Agreement" otherwise. *Id.* ¶¶ 65-66. The DSS Agreement required PACEM to obtain an export license from the State Department authorizing the transfer of the grenades, and conditioned delivery on that approval. Counterclaim ¶¶ 69-70. On December 19, 2023 DSS made a deposit of $█████████. Ans. ¶ 24. DSS subsequently provided an additional $█████ in payments. *Id.* ¶¶ 129-131.

On January 2, 2024, PACEM submitted its DSP-5 application, after which a State Department employee asked whether BBM would be participating in the transaction. Counterclaim ¶¶ 74-75. PACEM explained to that employee that BBM would not be participating, and the State Department approved PACEM's DSP-5 application on January 22, 2024. *Id.* ¶¶ 76-77. After approval, PACEM began preparing the grenades for delivery to DSS. *Id.* ¶ 79.

Contrary to DSS's assertions, however, BBM *was* participating in the replacement transaction. Counterclaim ¶¶ 80-83. On January 30, 2024, PACEM learned of BBM's participation

3

when DSS's CEO insisted that BBM be on a phone call because they were assisting with the project. *Id.* ¶¶ 84-85. Then, during a February 2 phone call, DSS's CEO attempted to disclaim BBM's participation, and on February 5 sent a letter claiming that BBM was "no longer associated in any way with this transaction." *Id.* ¶¶ 91-93. DSS understood this letter to mean that "BBM *had* been participating in the project" prior to those February 2024 assurances. *Id.* ¶ 96.

Because of BBM's participation, DSS became concerned that the State Department would view the export license as having been obtained through material misstatements and was thus invalid. Counterclaim ¶ 97. PACEM therefore disclosed to the State Department its understanding of BBM's involvement, after which the parties submitted a DSP-6 application to amend the previously-submitted DSP-5. *Id.* ¶¶ 100-105. PACEM believed (and reiterated to DSS) that it could not export grenades under the existing State Department approval. Counterclaim ¶¶ 106-107. It said that it would only be able to ship grenades after the amended export application was approved. *Id.* ¶ 108. PACEM repeatedly sought guidance from the State Department as to whether the approved DSP-5 was impaired, but did not receive any. *Id.* ¶¶ 109-110.

As time progressed without approval of the amended export application, PACEM was in a difficult position because of its limited storage capacity. Counterclaim ¶¶ 123-124. In addition to its agreement with DSS, PACEM "had an additional fully funded contract with Spetstechnoexport for the same type of grenade . . . scheduled for production after the BBM contract completed." *Id.* ¶¶ 125-126. While PACEM waited for valid regulatory approval of its DSS exports, it would have either had to shut down production or ship the existing grenades to Spetstechnoexport. *Id.* ¶ 132. To avoid defaulting on the Spetstechnoexport contract, PACEM shipped the grenades previously identified for DSS. *Id.* ¶¶ 133-134.

Then, in May 2024, the State Department informed PACEM that the existing approval of exports to DSS was "impaired" because of BBM's involvement, and that the DSP-6 was unlikely to be approved. Counterclaim ¶ 135. On October 23, 2024, the State Department informed PACEM that the amended export application was "returned without action," and that given the prior involvement of BBM it could not provide retroactive approval for those activities." *Id.* ¶ 141. Because PACEM never had appropriate export approval, it could not deliver the grenades to DSS. *Id.* ¶¶ 143-147.

### B. Procedural Background

DSS filed a Complaint in this Court on July 31, 2024. ECF 1. PACEM moved to dismiss on September 5, 2024. ECF 14. The Court granted the motion to dismiss Counts I, III, and IV of Plaintiff's Complaint without prejudice. ECF 33. DSS filed its Amended Complaint on December 13, 2024. ECF 42. PACEM moved to dismiss Count I (fraud in the inducement) for failure to state a claim. ECF 49. The Court denied that motion on January 31, 2025. ECF 65.

PACEM filed its Answer and Counterclaim on February 14, 2025. PACEM's Counterclaim includes counts for fraud in the inducement and breach of contract. Counterclaim ¶¶ 149-178. DSS moved to dismiss both counts on March 7, 2025. ECF 76; ECF 77 ("MTD"). PACEM filed its opposition on March 21, 2025, ECF 86 ("Opp."), and DSS filed its reply on March 27, 2025, ECF 91 ("Reply").

## II. LEGAL STANDARD

"To survive [a motion to dismiss under Rule 12(b)(6)] a complaint (or counterclaim, as is the case here) must contain sufficient facts to state a claim that is 'plausible on its face.'" *E.l. du Pont de Nemours*, 637 F.3d 435 at 440 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining whether a party has stated a plausible claim, "a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (quoting *Erickson v. Pardus*, 551 U.S.

5

89, 94 (2007)). But those allegations must amount to more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. And in considering a motion to dismiss a counterclaim, a Court may also "rely on facts pled in the complaint, but only to the extent they have been admitted in [the] answer." *1600 Walnut Corp. v. Cole Haan Co. Store*, 530 F. Supp. 3d 555, 558 (E.D. Pa. 2021).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a [counterclaim] pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).

### III. ANALYSIS

DSS argues that PACEM has failed to state a claim under either a fraud or contract theory because it has not alleged that it was financially harmed or suffered any other damages as the result of DSS's actions. MTD 4-6, 7-8. Because this argument succeeds and the failure to allege damages is sufficient to resolve DSS's motion, the Court need not address the other reasons it argues PACEM has failed to state a claim.[2]

A Virginia law claim for fraudulent inducement requires showing "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and **(6) resulting damage to the party misled**." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (quoting *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)) (emphasis added). And "[t]he elements of a

---

[2] In addition to addressing damages, DSS argues that PACEM's fraud claim must be dismissed because its allegations are inconsistent, MTD 6-7, and its contract claim should be dismissed because it has not identified a specific breach of a contractual duty, MTD 8-10.

6

breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and **(3) injury or damage to the plaintiff caused by the breach of obligation**." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (emphasis added).

PACEM's right to relief on each of its counterclaims thus depends on whether it has adequately pled damages. But it has not. Indeed, the allegations in the counterclaim (coupled with the admissions in PACEM's Answer) support an inference that PACEM has *benefitted* from DSS's actions rather than suffered damages. PACEM has received at least $▮▮▮▮▮▮ in payments for the grenades under the BBM and DSS Agreements (and over $▮▮▮▮▮▮ from DSS directly under the DSS agreement), Ans. ¶¶ 11, 129-131, shipped one of eight grenade shipments, Counterclaim ¶ 28, and was able to ship the grenades to an alternative customer at a higher price, Ans. ¶ 67. Even viewing the counterclaim in the light most favorable to PACEM, damages are at best a mere possibility, [3] and the Court cannot reasonably infer that PACEM has been harmed while at the same time retaining millions of dollars in payments for products that were never delivered. *Iqbal*, 556 U.S. at 678. That is, while the counterclaim pleads facts that are "consistent with" the existence of damages, it "stops short of the line between possibility and plausibility" of such damages." *Id.*

In its opposition, PACEM argues that because it "could not fully perform on the DSS Agreement, PACEM Defense incurred costs and was denied the benefits it would have received had it been able to fully perform." Opp. 10. But this is the stuff of "labels and conclusions." *Twombly*, 550 U.S. 544, 555 (2007). Indeed, the only factual matter that PACEM cites in support of its claim for damages is that it was put "in a difficult logistical position" that was solved by shipping grenades to Spetstechnoexport. Counterclaim ¶¶ 123-131. The other paragraphs it cites

---

[3] This would be the case if the expected profits from the DSS agreement were greater than the funds it received for the grenades to be delivered under that contract (something PACEM does not specifically allege).

7

are conclusory statements that PACEM "has suffered damages," "is entitled to damages," and was "deprived . . . of the right to receive the full benefits under the contract." *Id.* ¶¶ 148, 172, 178. None of them are facts allowing for an inference that the damages sustained exceed PACEM's benefit from retaining BBM and DSS's payments for the grenades. All this stands in contrast to cases in which damage has been sufficiently pled by identifying "specific monetary losses." *SunTrust Mortgage, Inc. v. K. Hovnanian Am. Mortgage, LLC*, 2012 WL 13029758, at *1 (E.D. Va. July 9, 2012); *see also Therabody, Inc. v. Walton*, 2024 WL 1260577, at *5 n.7 (E.D. Va. Mar. 25, 2024) ("Specifically, Plaintiff alleges that it has been damaged in an amount to represent the difference between (a) the market value of the Products and (b) the discounted cost at which Plaintiff was fraudulently induced to sell the products to Defendant."). Accordingly, both counts of PACEM's counterclaim must be dismissed for failure to plead damages.

### IV.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff and Counterclaim Defendant's Motion (ECF 76) is **GRANTED**; and it is further

**ORDERED** that Defendant and Counterclaimant's Counterclaim is **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that Defendant and Counterclaimant may, within ten (10) days file an amended counterclaim; and it is further

**ORDERED** that this Memorandum Opinion and Order shall be placed under seal and that the parties shall confer as to an appropriate redacted public version and present that proposed redacted copy, together with any unresolved issues, to the Court within seven (7) days of the date of this Memorandum Opinion and Order.

**SO ORDERED.**

/s/
Michael S. Nachmanoff
United States District Judge

April, 16, 2025
Alexandria, Virginia